**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**BRUNSWICK DIVISION**

| | |
|---|---|
| A&J MANUFACTURING, LLC, and A&J MANUFACTURING, INC., <br>             Plaintiffs, <br><br>      v. <br><br> RANKAM METAL PRODUCTS MANUFACTORY LIMITED, USA, <br>             Defendants | CIVIL ACTION NO. <br> 2:13-CV-00121-LGW-RSB |

**DEFENDANT RANKAM'S REPLY BRIEF IN SUPPORT OF ITS**
**MOTION TO STAY PENDING REEXAMINATION**

The opposition brief by plaintiff A&J Manufacturing, LLC ("A&J") is replete with misstatements and misunderstandings. A&J's Response cites the wrong statistics for appeals at the USPTO, then argues that this very real timeline is somehow indefinite. A&J contends that "final rejections" by the USPTO are not final and that a gap of six months between reexaminations is an "undue delay." A&J falsely claims that the defendants have admitted infringement and agreed no discovery for validity or infringement is needed, when the record clearly states the opposite. Despite its numerous misstatements, A&J still points to no legally cognizable prejudice that would result from a further stay.

Rankam files this Reply in Support of its Motion to Stay [Dkt. No. 40] to correct the record for the benefit of the Court. This Reply addresses A&J's errors substantially as they occur in A&J's Response.

### A. The average time for appeal that Rankam cited in its motion is correct

A&J contends in its Response that Rankam understated the average time for appeal of the reexamination at the USPTO:

> Rankam selectively cites the fastest possible time for appellate review in the USPTO statistics—7.3 months, and say [sic] that things should be done at the USPTO in a year. However, a review of those same statistics shows that the "overall" pendency for an appeal is 26.1 months, with the longest taking over 31.3 months.

[A&J Response, Dkt. 42, p. 6.] A&J misreads the cited USPTO statistics and thus exaggerates the average appeal pendency.[1] As background, Congress has mandated that the USPTO conduct *ex parte* reexaminations—including appeals of reexaminations to the PTAB—with "special dispatch." 35 U.S.C. § 305. The USPTO assigns all reexaminations to the Central Reexamination Unit ("CRU"), a specialized group within the USPTO charged with meeting this mandate. Remy Yucel, *Patent Public Advisory Committee Quarterly Meeting: Patent Operations Update*, USPTO 20 (2016) (describing the CRU's "central mission" of handling all reexamination proceedings to ensure compliance with the statutory mandate), *available at* https://www.uspto.gov/sites/default/files/documents/20160505_PPAC_Operations_Update.pdf. In contrast, "normal" patent applications (for applicants seeking new patents) are assigned to the various "technology centers" according to the technical area of the patent application. *See* https://www.uspto.gov/patent/contact-patents/patent-technology-centers-management.

---

[1] It should be noted that Rankam, in its Motion to Stay, cites to the July 2017 PTAB Appeal Statistics Report, while A&J's Response cites the August 2016 data, provided for comparison purposes, from the August 2017 PTAB Appeal Statistics Report (URL links embedded). The August 2017 Report is the most recent available data as of the filing of this reply.

Here, the appeal from the examiner's action to the PTAB originates from the CRU. So Rankam correctly cited the USPTO statistic for the average pendency of appeals *from the CRU* in its motion to stay. *See* [Dkt. No. 40, p. 4–5]. The average pendency in July 2017 and August 2017 for appeals originating *from the CRU* is only 7.3 and 7.7 months, respectively. A&J, on the other hand, cites the average time for *all* PTAB appeals (26.1 months for August 2016), which includes appeals of CRU reexaminations *and* appeals from ordinary patent prosecution. A&J also notes that the longest appeal (31.3 months, also for August 2016) is for appeals of an examiner's prosecution decision regarding *design patents*. Not only do these prosecution or "Overall" statistics have little if any relevance to the question at issue—estimating the time to complete an appeal from a CRU decision concerning a utility patent, US Patent No. 8,381,712 ("the '712 patent")—A&J's cited statistics are from last year. The disparity between the shorter average pendency for *reexamination* appeals and the longer pendency for *ordinary prosecution* appeals confirms Rankam's argument that the USPTO is likely to complete the appeal quickly, in compliance with the statutory requirement.[2] As A&J observes, the pendency for appeal with the CRU is (by far) the "fastest" appeal timeframe within the USPTO—not at all the "snail-like pace" as A&J alleges. [A&J Response, Dkt. 42, p. 6–7.] Appeals that do *not* originate from reexaminations have a much longer average pendency, but are not at issue here.

### B.   A stay would not be "immoderate or indefinite"

As noted above, the length of the reexamination appeal is not likely to be "immoderate or indefinite," as A&J implies it might. And A&J relies on cases where the stay issue arose under much different circumstances than here. A&J's Response quotes *Cherokee Nation of Oklahoma*

---

[2] In fact, proceedings at the USPTO have moved at a rapid pace so far. Academy filed its request for reexamination of the '712 patent on June 6, 2016. Just ten months later, on April 7, 2017, the USPTO issued a Final Decision.

*v. United States*, 124 F.3d 1412, 1416 (1997), which states that "[a] stay that is so extensive that it is 'immoderate or indefinite' may be an abuse of discretion." [A&J Response, Dkt. 42, p. 4.] In *Cherokee Nation*, however, the stay was deemed "indefinite" because the trial court had granted a stay for the duration of a state court quiet title action that *had yet to be filed*—and still had not been filed three years after the stay was instituted. *Cherokee Nation*, 124 F.3d at 1415–16. The parties in that case agreed that a judgment in any such quiet title action "might be decades away." *Id.*

The facts here are much different. The termination of A&J's appeal of the reexamination proceeding is much nearer and more certain. A&J filed its reexamination appeal brief on September 7, 2017. As discussed in Rankam's Motion to Stay, the USPTO's response is due November 7, and A&J then will have two months (until January 2018) to submit its reply brief. The appeal will then be submitted to the PTAB and, as discussed above, the average pendency of an appeal from the CRU to the PTAB is less than eight months. If this case falls within the average, the decision date would be in September 2018, approximately 11 months from now. That is a far cry from the stay of potentially "decades" in *Cherokee Nation*. The USPTO's published statistics—as correctly cited by Rankam—inform the Court as to the average length of the stay and show that the requested stay in the current case would be neither immoderate nor indefinite.

Additionally, the *Crocs* case cited by A&J in its "Legal Standard" section does not support A&J's argument because it was the defendant in Crocs moving to vacate the stay after the PTO ruled that it would not review one of two asserted (the '858 patent). While the reexamination had invalidated a different patent (the '789 patent), the '858 patent remained for decision by the district court. *Crocs, Inc. v. Cheng's Enters.*, No. 06-CV-00605-PAB-KMT,

4

2016 U.S. Dist. LEXIS 53476, at *3–5 (D. Colo. Apr. 21, 2016). The *defendants* argued that their "business interests and market share" had been negatively impacted by the looming litigation of the '858 patent, so they would be prejudiced by having to wait until plaintiff exhausted its appeal rights on '789 patent before finally and inevitably addressing the other infringement claims under the '858 patent. *Id.* at *7. The Court agreed and lifted the stay. *Id.*

Here, there is no other patent A&J is asserting. As for the lone asserted patent, the '712 patent, A&J does not and cannot contend that its business or market share is affected because it has acknowledged that Rankam is no longer infringing. Thus, A&J is only claiming past infringement, which is compensable by past damages (if at all).

    **C.**    **The USPTO's "final rejection"** *is* **final**

A&J incorrectly states that "the USPTO's 'final rejection' is actually not yet final and faces further scrutiny and review at the USPTO," and that "it is possible that the USPTO could simply change its mind and remove all grounds of rejection." [A&J Response, Dkt. 42, p. 6.] A&J cites to *Boston Scientific Corp. v. Cordis Corp.,* 777 F. Supp. 2d 783, 789-90 (D. Del. 2011), and states that the case stands for the proposition that "an *initial non-final* and non-binding action by the USPTO and subsequent reexamination may not narrow the issues in the case or eliminate the need for trial." [A&J Response, Dkt. 42, p. 6 (emphasis added).] An *ex parte* reexamination is much like typical prosecution of a patent; the examiner issues a first, non-final action and then, after the patent owner responds, the examiner issues a final action, such as the final rejection issued in the '712 patent reexamination. As A&J noted, the court in *Boston Scientific* was dealing with a first, *non-final* action, which is *not* final—hence the name. Thus, the rejections in the non-final action could be reversed after amendments and a response from the patent owner. In other words, in *Boston Scientific*, the reexamination was not yet complete.

5

In contrast, the '712 patent reexamination in this case is over. The CRU issued a final rejection and has closed the reexamination. Unless the PTAB on appeal reverses the examiner and orders remand (or there is a later reversal by the Federal Circuit), the CRU will not play any further role in these proceedings.

Furthermore, A&J speculates that the USPTO may "simply change its mind and remove all grounds of rejection," [A&J Response, Dkt. 42, p. 6.], but it offers no argument or evidence to explain why this might be the case. Statistics show that the PTAB reversed CRU *ex parte* reexamination decisions only 28% of the time in the past year.[3] It is much more likely that the CRU's final rejection will be affirmed, thus terminating the '712 patent.

### D. There was no undue delay in Academy's filing of the reexamination request

A&J contends that "Academy waited until 2016 to file its reexamination, almost three years after this case was filed and stayed to allow the ITC action to proceed … to gain a tactical advantage in attempting to delay the restarting of this case." [A&J Response, Dkt. 42, p. 7–8.] However, A&J omits the fact that during those three years between the conclusion of the ITC proceeding and Academy's filing of the reexamination, a different patent review proceeding was in progress. In October 13, 2014, The Brinkman Corporation ("Brinkmann"), one of the other defendants accused of infringing the '712 patent, petitioned the USPTO for a review of the validity of the '712 patent. As discussed at the June 8, 2017, Status Conference, Brinkmann went bankrupt late in the IPR proceedings—after the PTO had already found a likelihood of success on Brinkmann's part and instituted the trial, all briefing was completed, and the PTO had set the final oral hearing date. As part of the settlement between A&J and the trustee in Brinkmann's

---

[3] *See* PTAB, Receipts and Dispositions by Technology Centers, Fiscal Year 2017 Monthly Dispositions (August 2017) (last accessed Oct. 2, 2017) (URL link embedded).

bankruptcy, the trustee terminated the IPR on December 21, 2015. [*See* Transcript of Status Conference, p. 25, lines 14-19, p. 28, lines 18-24.] On June 6, 2016—less than 6 months later—Academy filed a request for the current *ex parte* reexamination to continue the challenge of the '712 patent at the USPTO. Six months is not an "undue" amount of time to prepare and file a request for reexamination, which must include and argue every ground for invalidity the petitioner wishes to present for the rest of the proceedings. *See* 37 C.F.R. § 1.510(b) (listing parts for a request for *ex parte* reexamination).

Furthermore, it cannot be said that Academy waiting to file the reexamination until after the IPR was terminated was done with "dilatory purpose". [A&J Response, Dkt. 42, p. 8.] Academy would not have thought filing a request for reexamination was necessary until it found out that the IPR had been terminated. *See Tomco2 Equip. Co. v. Se. Agri-Systems*, 542 F. Supp. 2d 1303, 1312 (N.D. Ga. 2008) (finding that the defendant waiting until after settlement negotiations failed to seek reexamination was not a "dilatory tactic").

   **E. A&J misstates the nature and effect of Rankam's settlement**

While it is of marginal relevance to A&J's opposition to the motion to stay, A&J misstates Rankam's position regarding infringement at the ITC and the effect of the Consent Order Rankam agreed to. A&J states: "Rankam has admitted infringement, having done so to escape the ITC." [A&J Response, Dkt. 42, p. 8.] This statement is false. While Rankam agreed not to import, sell, etc., the accused grills, Rankam never "admitted infringement." In fact, paragraph 7 of the Rankam's consent order stipulation, attached as Exhibit A, specifically states otherwise: "The signing of this Consent Order Stipulation is for settlement purposes only and *does not constitute an admission by Rankam that any unfair act has been committed*." Consent Order Stipulation ¶ 7 (emphasis added).

As the Court is aware, there are numerous reasons to enter a consent decree—including having a perfectly acceptable design-around readily available. *See, e.g.*, Consent Order Stipulation, ¶ 3 (noting that under the Commission's June 27, 2014, Decision, two other grill models do not infringe and were not "Subject Articles" in the proceeding). Rankam's settlement was no concession of infringement.

Additionally, A&J incorrectly states that the ITC found infringement of the '712 patent "by almost all respondents … *including the defendants*" in this Court. [A&J Response, Dkt. 42, p. 2 ¶ 5 (emphasis added).] As A&J acknowledges in the next paragraphs of its Response, Rankam settled out of the ITC proceedings before the ITC trial and resulting decision. Compare Consent Order Stipulation, p. 4*, with* A&J Response, Dkt. 42, p. 3 ¶ 5. In addition, defendants Char-Broil and Fudeer were found *not* to infringe by the ITC, and that finding was affirmed by the Federal Circuit. Some of the grills of some of the other defendants in the cases pending before this Court (e.g., OLP) were found not to infringe as well. Finally, there was no finding of infringement as to Blue Rhino or its grills; Blue Rhino was not even a party to the ITC proceeding. Blue Rhino was sued by A&J on the '712 patent in 2015, and Rankam understands Blue Rhino is also seeking a stay.[4]

### F. Any appellate review of the reexamination should not factor into the Court's decision on the motion to stay

A&J states that "[a]ny decision of the USPTO here during the initial patent reexamination, if ultimately adverse to A&J, can face three levels of appellate review," first to the PTAB, and then to the Federal Circuit and Supreme Court. [A&J Response, Dkt. 42, p. 5.]

---

[4] Also, A&J incorrectly states that "all the parties … admitted" that *only* discovery related to damages is needed. A review of transcript of the June 8, 2017, status conference shows that no such statement was made by the defendants. *See generally* Dkt. No. 45.

8

First, A&J has already appealed (and had by the time it filed its Response) the examiner's rejection of all A&J's patent claims to the PTAB. So the appeal process is already underway. More importantly, the subsequent "levels of appellate review" are the same as for any other type of matter and should not be taken into consideration. If the standard appeals process was a bar to staying a case, then no cases would ever be stayed. Last, A&J notes that it might petition the Supreme Court for certiorari—again, only after another loss—and that the petition and possible grant should militate against a stay. Notwithstanding A&J's hyperbole on this point, such a remote possibility should not factor into the Court's decision.

### G. A&J has still not shown any cognizable prejudice

Finally, A&J has not established, or really even argued, any cognizable prejudice. A&J's Response states that "[t]he prejudice to A&J for any further delay in resolving this four-year-old case is plain." [A&J Response, Dkt. 42, p. 3.] However, the only purported "prejudice" A&J can point to is the potential delay (the limited extent of which is discussed above). As noted in Rankam's Motion to Stay, "[t]he delay inherent to the process of the U.S. Patent and Trademark Office's reexamination of a patent claim does not constitute, by itself, undue prejudice." *Photoflex Prods. v. Circa 3 LLC*, 2006 U.S. Dist. LEXIS 37743, at *5 (N.D. Cal. May 24, 2006). As admitted by A&J's counsel at the June 8, 2017, Status Conference, none of the defendants are "making grills any longer that infringe either the '712 or the design patents, so we're talking about past actions as opposed to ongoing actions in this case." [Dkt. No. 45, 18:20-23.] Thus, A&J will be seeking to prove that infringement occurred during a limited, long-past window of time and seeking damages only as its remedy for that past infringement. *See Datatreasury Corp. v. Wells Fargo & Co.*, 490 F. Supp. 2d 749, 752 (E.D. Tex. 2006) (finding "the availability of money damages is sufficient to protect plaintiff from prejudice").

With no alleged on-going infringement and a relatively short appeal time, A&J cannot point to any cognizable prejudice in staying this case. The Court should stay this case until the review of the reexamination proceeding is completed and the Court can definitively determine whether any claims remain to be litigated and, if so, what those claims are.

Dated: October 2, 2017     Respectfully submitted,

/s/ Warren J. Thomas
John W. Harbin (Ga. Bar No. 324130)
Warren J. Thomas (Ga. Bar No. 164714) (pro hac vice)
William C. Pannell (pro hac vice to be filed)
MEUNIER CARLIN & CURFMAN LLC
999 Peachtree Street, NE, Suite 1300
Atlanta, Georgia 30309
Tel: (404) 645-7700
Fax: (404 645-7707
jharbin@mcciplaw.com
wthomas@mcciplaw.com
wpannell@mcciplaw.com

James B. Durham
HALL BOOTH SMITH, PC
3528 Darien Highway, Suite 300
Brunswick, GA 31525
Phone: 912-554-0093
Email: jdurham@hallboothsmith.com

*Counsel for Defendant Rankam Metal Products Manufactory Limited, USA*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing paper has been served on all counsel of record via the CM/ECF system on October 2, 2017.

/s/ Warren J. Thomas
Warren Thomas
*Counsel for Defendant Rankam Metal Products Manufactory Limited, USA*